## 19380

Emma L. FLINKINGSHELT, Individually and as Trustee, and Larry R. Flinkingshelt, both of whom represent a class, Appellants, v. John E. JOHNSON, Jr., et al., Respondents.

(187 S. E. (2d) 233)

*Messrs. Robert A. Clay* and *Price & Poag,* of Green-
ville, *for Appellants,*

*David L. Freeman, Esq.,* of Greenville, *for Respondents,*

*Messrs. Robert A. Clay* and *Price & Poag,* of Green-
ville, *for Appellants, in Reply.*

March 6, 1972.

*Per Curiam:*

In this declaratory judgment proceeding plaintiffs-appellants sought to have certain restrictive covenants declared void and of no effect as to certain lots owned by them. The appeal is from a decree denying them any relief, which decree will be reported herewith. We have fully considered such decree, the entire record and the briefs of counsel and conclude that the appellants have failed to demonstrate any prejudicial error. We are also of the view that there was no prejudicial error in the order of the lower court settling the case on appeal.

The judgment of the lower court is, accordingly,

Affirmed.

## ORDER OF JUDGE NESS

The plaintiffs seek in this action a declaratory judgment that a covenant prohibiting the use of the land in question, an area approximately eleven hundred (1,100) feet by three hundred (300) feet on the east side of Pleasantburg Drive, from commercial and industrial growth and development *et seq.,* is no longer in effect and should be annulled. This covenant is contained in an instrument dated November 28, 1951 and recorded in the office of the Clerk of Court of Greenville County in Deed Book 447, at page 149.

The complaint alleges that the restrictions should be extinguished upon the grounds:

1. That there was no general plan or scheme for the development of all the properties subject to the provisions of Cavalier Heights, and

2. That since the covenants were imposed, there has been such a radical change in the character of the neighborhood, in reference to the property in question, as to destroy the essential object and purpose of said restriction.

This matter was heard by me on April 21, 22, and 23, 1970, at which time voluminous testimony was taken, evi-

dence received, and the Court, at the request of the parties, viewed the premises in question and the property subject to the restrictions.

The plaintiffs do not attempt to invalidate the residential restrictions as to any property other than the eleven hundred (1,100) by three hundred (300) feet area, which is situate on Pleasantburg Drive and approximately three hundred (300) feet on Cleveland Street Extension.

It appears that the number of individual owners of property within the restricted area and the number of holders of mortgages within the restricted area are so numerous that it would be impractical to join all of them and it is necessary to have a representative of each class defend or appear for the entire class. It further appears that the defendants named and who have appeared in the proceeding are representative of the owners of property and representative of the holders of mortgages on the property and that this is a *bona fide* class action of which the Court has jurisdiction both of the parties and the subject matter.

## FINDINGS OF FACT

In November of 1951, some ten owners of contiguous property entered into a written agreement imposing restrictive covenants upon their land; this property was referred to in the restrictions as "Cavalier Heights." The restrictive covenants and attached plat were duly recorded in the office of the R.M.C. for Greenville County. These restrictions recited as their purpose to keep Cavalier Heights "free from the influence of housing projects, crowded conditions, commercial and industrial growth and development, to the end that a residential area of attractive homes, substantial families and pleasant surroundings will be maintained." Minimum lot sizes were specified in the residential restrictions and the use of property was restricted to single-family residences.

At the time these restrictions were entered into, Pleasantburg Drive (sometimes referred to as By-Pass 291) was

a known fact, being shown on the plat as one boundary of the restricted area, and was of comparatively new construction or in the process of construction. From that time the property fronting on the highway would yield higher prices from commercial sales than residential and it was within the contemplation of the parties that unless restrictions were imposed, the property fronting on the new Pleasantburg Drive would become commercial in nature. One of the major purposes in imposing the restrictions was to preclude the development of commercial property along the easterly side of Pleasantburg Drive. As appears from the plat attached to the restrictions, some of the signatories to the restrictions owned property on the other or westerly side of Pleasantburg Drive and could have included some or all of such property within the restricted area had that been their desire. In particular, plaintiff's predecessor in title, Tullie P. Babb, owned property on both sides of said highway but elected not to residentially restrict the property on the westerly side of said highway.

After the imposition and recording of these restrictions, numerous lots have been sold and substantial homes built thereon. Numerous deeds were made without mention of the recorded restrictions and numerous deeds were made which made reference to the recorded restrictions. It is of no legal significance whether the restrictions were mentioned in a deed or not since they were of record, and known to most purchasers. The testimony shows, and I conclude from any personal inspection of the area, that this is one of the largest residential areas in the State, and the homes constructed therein are of superior quality and size and of considerable worth. The general, broad scheme or plan has resulted in uniformly high quality, large, attractive lots and homes. The recited purpose of the restrictions has been attained.

The existence of the residential restrictions over such a large area has been, to a large part, responsible for the high-grade development which has been experienced in this area.

The prices which owners of property obtained from the sale of lots within this area have been increased substantially due to the type of high-character residential development which has occurred which, in turn, is attributable, to a large extent, to the residential restrictions.

A substantial proportion of the Cavalier Heights property was owned by Tullie P. Babb, a signatory to the original restrictions. Upon his death, the property was inherited by his widow who in turn conveyed the same to the plaintiff, Emma L. Flinkingshelt (stepdaughter of the decedent) as Trustee. This property was platted into residential lots and the plaintiff as Trustee from time to time made numerous sales of property in conformity with the restrictions and also made conveyances to other members of her family, some of whom sold the property and some of whom continued to own it. Some of the conveyances which plaintiff made were of property on the west side, the unrestricted side, of Pleasantburg Drive. This property has now been sold and is presently used for commercial purposes. No attempt was made by the plaintiff at the time of the conveyances of property on the westerly or unrestricted side of Pleasantburg Drive to restrict the property for residential uses although such restriction could have easily and properly have been imposed in the conveyances by plaintiff.

The plaintiff as Trustee, and individually, and other members of her family have retained property fronting on Pleasantburg Drive. They have steadfastly refused offers to purchase this property even though substantial prices could have been obtained for the property generally commensurate with prices they have obtained for other residential property. On the other hand, the plaintiffs have sold to some of the defendants property backing up the subject property, and these defendants, in reliance on the residential restrictions, have constructed substantial and attractive homes on the property so purchased.

It appears to me that the plaintiffs, in retaining their property fronting along Pleasantburg Drive and in refusing

to sell it for substantial prices, have intended to utilize it, not for residential purposes but at a later time intended to sell it for commercial prices upon obtaining a court decision voiding the restrictions as to this property.

The utilization of the subject property for other than residential purposes would have a serious and depreciating effect on the homes immediately adjoining the subject property and would, to a lesser degree, have a depreciating effect on other property in the near vicinity.

When viewing this property, I stood at the rear of the defendant, Johnny Johnson's house and, with all the trees which were there at that time, could see vehicles at door level passing on Pleasantburg Drive. The noise, however, with all the trees there, was minimal.

Since the imposition of the restrictions, the following developments have occurred:

Commercial development has occurred along the westerly side of Pleasantburg Drive up to its intersection with Cleveland Street Extension. A service station and convenience food store are situate at the intersection of Cleveland Street Extension and Pleasantburg Drive and a bowling alley and theaters with a parking area in front of them, are situate some three hundred (300) to four hundred (400) feet back from Pleasantburg Drive. Adjoining the theater establishment was a quick-food service establishment fronting on Pleasantburg Drive. All of these developments have occurred on property owned by the plaintiff as Trustee and conveyed unrestricted by her. Farther north, on either side of Pleasantburg Drive, is a church and Greenville Technical Education Center and, in addition, on the west side of Pleasantburg Drive is an office building and a veterinarian's building. Beyond the church and the Greenville Technical Education School, Pleasantburg Drive may be characterized as commercial. These developments have occurred since the construction of Pleasantburg Drive.

Pleasantburg Drive has been widened into three lanes of traffic in each direction plus a center lane at intersection for left turns.

With the opening of Interstate Highway 85 a short distance away, the character of the traffic on Pleasantburg Drive has changed from predominantly truck traffic and through vehicular traffic to local automotive traffic.

The number of vehicles traveling on the highway has increased over the last 18 years. There is no showing that the traffic increase on this particular highway has been greater than the general traffic increase throughout the country of which the Court may take judicial notice. Although the subject property has a value which is considerably higher from a commercial standpoint, it is nevertheless suitable for residential use. The property is worth some less from a residential standpoint than property removed from the highway, due to the commercial property across Pleasantburg Drive, but, because of its proximity to, and being a part of, the high-grade residential area, substantial prices can be realized from the sale of the property for residential purposes. While the residences which might be built on this property would not necessarily be as large or expensive as those immediately to the rear, they would be in keeping with the general neighborhood scheme, and the stated purpose of the restrictions, which have benefited all parties.

There have been no substantial, substantive violations of the restrictive covenants. Several lots, with the consent of adjoining owners, were sold with less than the minimum depth required but in those few instances the total area of the property was approximately equal to or greater than the minimum required by the restrictions and the intent of the residential restrictions was fully met. When Interstate Highway 85 was constructed, a small portion of the original 500 acres was isolated on the southerly side of said highway from the other property of Cavalier Heights. Pursuant to valid court decree, the residential restrictions were

lifted from this small segment. That small segment is over 1½ miles from the subject property. The factual situation there bears no resemblance to the facts at bar and the existence of that decree does not justify in any way an invalidation of the restrictions as to the subject property. The only other so called violations of the restrictions shown is the existence of a church and school within the area. The existence of schools and churches within a large residential area such as this is consistent with the intentiton of the restrictions. Even assuming that such use and small deviations in lot size were not in accordance with the letter of the restrictions, and even assuming such use could have been enjoined, such use is no indication of a breakdown or deviation from the general residential scheme or purpose of the restrictions. The plaintiffs acquiesced in these so called violations and cannot predicate the relief now sought on the existence of a school and church within the residential area or deviations in the size of a few lots. I find that the overall plan and scheme of the restrictions has been maintained to a very high degree with the achievement of the desired results.

I further find that the continued enforcement of the restrictions will benefit all existing property owners who purchased their lots relying upon said restrictions, as it has benefited the original and subsequent owners of said lots and the plaintiffs herein. This is in accordance with my view of the properties and the testimony of many witnesses including, but not limited to, the testimony of the plaintiff's expert witness, Wilkins Norwood, who testified:

"Q. Would it not be your judgment, too, that as a matter of fact the restrictions in Cavalier Heights enabled the developers to sell lots at a, perhaps, enhanced value higher than they would have if the development had gone without restrictions?

"A. I'm sure. I can't conceive of developing a residential area without having restrictions on it."

## CONCLUSIONS OF LAW

Plaintiffs do not contend that there has been a breakdown in the general scheme of the restrictions or that within the restricted area there has been any change of condition or substantial violation or disregard of the restrictions. Plaintiffs allege that "defendants are estopped to deny that there has been a material change in the property subject to this action and are estopped to deny the voidance of the Protective Covenants." The Court concludes from the foregoing facts that there is no basis for this contention and that the defendants are not estopped to contend that the covenants are valid.

The language of the Supreme Court in *Martin v. Cantrell,* 225 S. C. 140, 81 S. E. (2d) 37 is apposite.

"The undisputed testimony shows that this tract of land was subdivided in 1923, thirty-one years ago, and that no business establishments have been erected on any of the restricted lots; in fact, that the only business establishment of any kind within the subdivision is Al's Ice Cream Bar, which was established prior to the time plaintiff acquired her property and on an unrestricted lot. We take this as very strong and almost unanswerable evidence that the general plan of a residential area has been maintained since the date of the subdivision and that the property owners so regarded it. We think that the plan from the beginning contemplated that the restricted area was to be used only for residential purposes and we further think that the actions of the landowners since that time show conclusively that they purchased or built their homes in this area resting confident in the belief that they were building or purchasing homes which would be protected by the sanctity of the written provisions of the deeds under which they held. We believe that the testimony as well as the acts of the lot owners throughout the years fully justify our opinion. We cannot possibly say, in view of the whole record, that this enterprise, which has been of such long standing, fails

to contain the necessary elements of a general scheme to subject the restricted lots to the operation of the uniform restrictions."

In essence, plaintiffs' contentions are premised on the fact that on unrestricted, adjoining and nearby property there have been commercial developments and there has been an increase in the amount of traffic and enlargement of the width of the highway which forms the boundary of the restricted area. It is obvious that any restricted area, whether it be residential or industrial, must have a demarcation line; it must end somewhere. Where the restricted area ends, other unrestricted development will or may foreseeably occur. To hold that commercial development in an unrestricted area adjoining a restricted area would allow the lifting of the residential restrictions as to property adjoining or in the vicinity of the unrestricted area, would be to expose all restrictions to eventual invalidation. It would remove the sanctity of long standing, long respected contractual agreements and place them at the whim of parties not privy to the agreements.

The Supreme Court in the *Martin v. Cantrell* case, *supra,* also dealt directly with the question of developments occurring outside the restricted area, stating:

"The plaintiff there, as in the case at bar, based her cause of action on changes of conditions outside of the restricted area. That court held that:

" 'The unmistakable weight of authority in this country answers this question in the negative,' " citing 26 C. J. S. Deeds § 171, p. 576 and numerous other authorities. Again quoting from this decision, we find:

" 'It is generally held that the encroachment of business and changes due thereto, in order to undo the force and vitality of the restrictions, must take place within the covenanted area.' "

Any modification of the foregoing rule suggested by *Dunlap v. Beaty,* 239 S. C. 196, 122 S. E. (2d) 9, would not

be applicable to this case since we are here dealing with a large, general development.

In *Pitts v. Brown,* 215 S. C. 122, 54 S. E. (2d) 538, the Court dealt with the effect of small violations within the restricted area and held:

"But the violation of some of the restrictions by some of the purchasers of lots in the tract, without action by appellant, does not affect his right to enforce the restrictions against the respondents." (Citing cases.)

Moreover, in this case, in particular, plaintiffs should not be allowed to invalidate restrictions on her property when the very circumstances about which she complains were permitted to happen on her own, or what was her own, property. In addition to this consideration, plaintiffs, having reaped the benefits of the residential restrictions by the sale of all their property subject to these restrictions (except the property in question) now seek to invalidate these restrictions so as to obtain a substantially greater price for commercial purposes. Plaintiffs are not satisfied to obtain a reasonable and substantial price from a residential standpoint. Substantial investments by the defendants in their lots and homes adjoining the subject property have been made in reliance on the existence of the residential restrictions. Such investments would not have been made had the subject property not been residentially restricted. It would be a grave injustice to those defendants to allow their property to be depreciated in value solely so the plaintiffs can now receive a greater value on commercial prices for the property which they have deliberately withheld from the residential market. It is not as though the plaintiffs cannot obtain a reasonable and substantial price for this remaining property; it is simply a matter of the plaintiffs wanting more, and this at the expense of the defendants. This, I do not feel, should be permitted.

It was suggested during the trial by plaintiffs' counsel that the Court could fashion a decree which, while vitiating

the residential restrictions, could impose certain conditions on the utilization of the land for non-residential purposes and thereby achieve a degree of protection to the adjoining residential owners. This relief is not sought by the Complaint and is not an issue before me. However, the point has been raised by plaintiffs' counsel and, in an effort to dispose of the whole matter, I will consider the question, even though one of plaintiffs' counsel admitted in the record that the case involved the removal not the amendment. On page 44 of the brief, paragraph 172:

The Court: I was under the impression, Mr. Clay, that your case here basically involved the removal of these restrictions on this one half of this one lot in question. The removal, not the amendment.

Mr. Clay: I agree with that.

There is no authority in South Carolina for the Court arrogating unto itself the power to rewrite residential restrictions. The most analogous South Carolina case called to the attention of the Court is that dealing with the power of the Court to modify a covenant not to compete, *Somerset v. Reyner,* 233 S. C. 324, 104 S. E. (2d) 344. This, our Supreme Court has held, it had no power to do.

"We cannot make a new agreement for the parties into which they did not voluntarily enter. The invalidity of the covenant is not aided by appellants' willingness to accept a restriction that is proper in scope."

Even assuming, however, that it would be within the discretion of the Court to make such modification, this Court would hold that under the circumstances no modification should be permitted. Under the facts and circumstances of this case it would be unconscionable to allow the plaintiffs to develop this property for commercial purposes even with the most stringent safeguards. Furthermore, once this Court has decreed certain conditions and modifications, the door would be open in subsequent litigation to seek to modify in another proceeding the restrictions imposed by this Court.

Thus, if any of the conditions become unsatisfactory to plaintiffs or to the purchasers or lessees from plaintiffs, one court action after another could be forthcoming.

In addition to this consideration, once this subject property is "unrestricted", owners of other residential property fronting on Pleasantburg Drive would, with justification, be able to come into court and point to a change of conditions—not of unrestricted adjoining property but a change of conditions of property within the original restricted area; thus giving them a much stronger case for modification than they presently have. Allowance of the relief sought by the plaintiffs in this case either with or without protective conditions, would be like a cancer in the residential area. Where the growth of the cancer would stop is difficult to predict but it is not difficult to predict that persons who have made substantial investments in reliance on the restrictions would suffer at the expense of allowing the plaintiffs to obtain a greater profit from their remaining property.

As stated in *Pitts v. Brown, supra:*

"It is a matter of common knowledge and human experience that if the restrictive bars are let down in this case, the business encroachment on the remainder of the subdivision would be a matter of gradual yet steady development, against which the home owners would be helpless, and the benefits and protection of the restrictive covenants would eventually be entirely lost."

The plaintiff in his proposed order seeks only to modify the restrictions and suggests that they be modified so that an executive plaza or office plaza be constructed on the front 250 feet thereof with certain conditions, and by conveying the rear 50 feet of the property to the property owners on Montrose in fee simple, with the understanding that no building will be constructed thereon.

This does not appeal to the Court for the reasons aforestated, and in addition thereto the plaintiff, by her own testimony, has no concrete plans for the building.

As stated in the case of *Dunlap v. Beaty, supra,* 239 S. C. at page 209, 122 S. E. (2d) at page 15:

"[T]he great weight of modern authority is that in an action under the declaratory judgment statute or one to remove cloud on title, affirmative relief may be granted against a restrictive covenant where there is such a change in the character of the neighborhood as to render the enforcement of the government valueless to the covenantee and oppressive and unreasonable as to the covenantor."

I find as a fact that there is no such change in the instant case, that would render the enforcement of the covenant valueless to the covenantee and oppressive and unreasonable as to the covenantor.

It is therefore ordered, adjudged and decreed:

(1) The residential restrictions executed in November 1951, pertaining to Cavalier Heights are valid and enforceable as to all property of plaintiffs situate on the easterly side of Pleasantburg Drive.

(2) Said property may be used only in accordance with the restrictions.

(3) The Complaint be, and the same is hereby, dismissed with costs.

Bamberg, South Carolina.